In re MARRIAGE OF LORRAINE HILKOVITCH, Petitioner-Appellee, and DENNIS HILKOVITCH, Respondent-Appellant.

First District (4th Division)   Nos. 82—809, 82—1460, 82—2200 cons.

Opinion filed May 24, 1984.

402

Herbert H. Fisher, Douglas Polsky, and Rinella & Rinella, Ltd., all of Chicago (David B. Carlson, Joseph G. Phelps, and David A. Novoselsky, of counsel), for appellant.

Beerman, Swerdlove, Woloshin, Barezky & Berkson, of Chicago (Nathan Swerdlove, Howard A. London, and Barbara N. Fox, of counsel), for appellee.

PRESIDING JUSTICE LINN delivered the opinion of the court:

On October 10, 1979, Lorraine Hilkovitch filed a petition for dissolution of her 12-year marriage to Dennis Hilkovitch. Following a contested trial in the circuit court of Cook County on the issues of property distribution, maintenance, and child support for the couple's two minor children, a judgment of dissolution of marriage was entered on January 14, 1982, the issues of attorney fees being reserved for future determination.

On February 5, 1982, Lorraine filed a petition for a rule to show cause, claiming that Dennis was in arrears in his unallocated maintenance and child support payments. After a hearing, Dennis was found to be in wilful contempt of court for failing to pay $12,396 in support due through April 30, 1982, and he was sentenced to 20 days in the Cook County House of Corrections. The commitment order also provided that Dennis could regain his freedom by paying one-third of the arrearage. Finally, on March 11, 1982, Lorraine filed an emergency petition for the appointment of "a receiver and/or sequestrator" to manage and sell Dennis' businesses, the proceeds of the sale to be used to pay the arrearages and for other purposes designated by the court. His responsive petition for change of venue was denied, and on September 9, 1982, an order was entered appointing a receiver-sequestrator.

Dennis Hilkovitch has filed three appeals. By our order, the appeals have been consolidated.

In the first appeal (No. 82—809), Dennis attacks the provisions of the January 14, 1982, dissolution of marriage judgment determining unallocated maintenance and child support, future support allowances, and property valuation and distribution. Specifically, Dennis argues that the trial court abused its discretion when it divided the marital property and determined the award of maintenance and child support because the statutory standards designed to guide decisions on both

issues were ignored. Alternatively, Dennis appeals from the order of April 1, 1982, denying him a new trial.

In the second appeal (No. 82—1460), Dennis attacks the post-judgment order of June 17, 1982, finding him in contempt of court for failing to pay an arrearage of $12,396 in unallocated maintenance and child support and sentencing him to 20 days' confinement as a sanction for the contempt. Dennis argues that his failure to pay was not a wilful violation of an order of the court and therefore not contumacious because the award itself was not based upon his actual income as established through his testimony and exhibits.

Finally, in the third appeal (No. 82—2200), Dennis attacks the September 9, 1982, order appointing a receiver-sequestrator of certain properties previously awarded to him, maintaining that the trial court erred in denying his motion for a change of venue and thereby rendered void all orders entered subsequent to its denial. Alternatively, if the denial of his motion was not error, Dennis claims that the trial court committed reversible error by (1) failing to conduct a hearing before appointing the receiver-sequestrator, or by (2) entering the order appointing the receiver-sequestrator when it had no jurisdiction to do so.

We affirm the decision of the trial court on all issues.

FACTS

Dennis and Lorraine Hilkovitch were married on November 18, 1967. During their marriage, Dennis was employed in the retail food and beverage industry, while Lorraine worked at Allstate Insurance Company until the birth of their first child in 1970. Since that time, Lorraine has been a full-time housewife, taking care of the couple's two children, Jason and Nicole, and managing the family's home. In 1979, however, Lorraine enrolled in a marketing program at a local junior college to prepare for re-entry into the work force, and she recently joined a neighbor in cleaning houses five or six days a month.

During the course of the marriage, the couple acquired interests in both real estate and business ventures. In 1969, they purchased a 50% interest in Plush Pup, Inc., a hot dog stand that Dennis managed. In 1972, they purchased a 33⅓% interest in a second hot dog stand, Plush Pup II, which was operated by another of the shareholding partners. Dennis and Lorraine bought a home in Park Ridge in 1974 and a vacant lot in Riverwoods in 1977. Finally, in 1978, they acquired a bar, named it "Nasty Habits," and incorporated it as JNH, Inc. Purchase of these properties was made through savings, bank loans, loans from Dennis' mother, Charlotte Hilkovitch, or a combina-

tion of these. Prior to trial, the parties stipulated that the net worth of the Park Ridge home was $100,000, the Riverwoods lot $55,000 to $60,000, and the three businesses together $155,000 to $160,000.

Testimony by the parties at trial established that Dennis earned $445 per week at the hot dog stand and $200 plus tips of $60 to $350 weekly from the bar. The couple's income tax returns reflect a yearly gross income of approximately $35,000 and a yearly net income of approximately $24,500. During the course of the marriage, Dennis gave Lorraine $430 weekly for household expenses, $230 by check drawn on Plush Pup, Inc., and $200 in cash. In addition, he would pay the couple's accumulated charge account bills, over $2,000 yearly in real estate taxes on both parcels of real estate, approximately $900 yearly for gifts, $2,500 yearly on vacations, and $40 weekly to go out to dinner, as well as giving Lorraine an additional $300 monthly when she ran short of money.

From 1975 to 1980, Dennis paid $110.50 per month on a home improvement loan. From 1978 to 1981, he spent $487.21 monthly to pay off a loan used to help in purchasing the bar, and in 1977 he began repaying a $25,000 loan from his mother at more than $1,000 monthly. From time to time he made other payments to his mother to reduce the balance of other loans she had made to him. During all this time, even when the couple traveled to Hawaii, Jamaica, Mexico, Europe, or the Bahamas, according to Lorraine their lifestyle did not change although Dennis was repaying significant sums each month for the various loans.

Dennis moved out of the marital home in May 1979 but continued paying the real estate taxes on both pieces of property as well as giving Lorraine approximately $2,000 monthly for household expenses. At the same time he was maintaining a separate household in an apartment. When the children visited with him, he took them to restaurants for their meals, at a cost of more than $30 daily. In the fall of 1980, he began giving Lorraine only $380 weekly, and he occasionally reduced that amount to $300 or less. At the same time, however, he agreed to make the payments on the couple's outstanding charge account balances.

At trial, Lorraine introduced two affidavits detailing her average monthly expenses and a statement showing the various debts accumulated by the couple with the monthly payments due on each. The first expense affidavit had been prepared immediately after the couple separated in 1979, while the second was prepared two years later at the time of the hearing. Lorraine testified that after she and Dennis separated, she was not able to maintain the same lifestyle the couple had

enjoyed while together, and the 1979 affidavit, which stated her necessary monthly expenses to be $2,376.15, reflected this drop in her standard of living and her corresponding inability to pay for automobile maintenance, dental work for the children, religious schooling, and some necessary household repairs. The 1981 affidavit, on the other hand, which stated her monthly expenses to be $3,488.24, took into account an increase in the cost of living, the assumption by Lorraine of several financial obligations previously paid by Dennis, and certain necessary projected expenses to be incurred in the near future.

During the course of the trial, Dennis sold his one-third interest in Plush Pup II to the remaining two partners for $4,984, a sale he claimed was forced. Lorraine protested that the sale was either a sham or a dissipation of marital assets because Dennis had stipulated at trial that the value of his stock was $50,000, and he previously had signed a written shareholders' agreement that apparently guaranteed him a minimum of $50,000 if he sold his interest to the other two partners.

When Dennis was called by Lorraine's attorney as an adverse witness (Ill. Rev. Stat. 1981, ch. 110, par. 2—1102), his testimony established that since his separation from Lorraine he had spent between $50,000 and $79,000 yearly. The 1979 post-separation bank statements reflecting his personal checking account showed additional monthly deposits of cash from Plush Pup and Nasty Habits ranging between $334 and $1489. Dennis also testified that he purchased cashier's checks with funds from either his personal account or one of the business accounts and used them to pay other personal bills.

At the conclusion of all the testimony and argument by counsel, the trial court entered a judgment of dissolution that contained, *inter alia*, the following findings and rulings:

    1. That the parties' stipulation and testimony established that the marital home and the vacant land together had the same net equity value as Dennis' equity interests in the three corporations, Plush Pup, Inc., Plush Pup II, and Nasty Habits.

    2. That the alleged sale of Dennis' interest in Plush Pup II was a sham and that he still retained his one-third interest in the stock of that corporation.

    3. That records in evidence and testimony relative to Dennis' spending habits established that his income was a minimum of $85,000 per year.

    4. That Lorraine was awarded $3,000 monthly for unallocated maintenance and child support for three years and $1,912.50

monthly thereafter as child support.

    5. That Lorraine was awarded custody of the children, the marital home including all the furniture and fixtures, her automobile, and the Riverwoods property, which she was directed to sell in order to have sufficient funds to invest and to reimburse Dennis' mother the balance of the loan she had given the couple to help buy the property.

    6. That both parties were ordered to execute all documents necessary to effectuate the above rulings, and if Dennis failed to convey to Lorraine his interest in the Riverwoods property within 90 days, the court had the power to execute the documents and complete the transfer.

By January 31, 1982, only 17 days after the entry of the judgment of dissolution, Dennis was $5,845 in arrears in his support payments, an amount that included support due under the prejudgment temporary orders. By April 27, 1982, the first hearing date on Lorraine's petition for a rule to show cause, the arrearage had grown to $12,396.

Dennis based his defense to the charge of contempt on the fact that during this period he claimed a gross income of $6,859.97, out of which he had paid Lorraine over $3,500, or nearly 50%, "clearly demonstrat[ing] that Dennis made the maximum possible contribution to the support and maintenance of Lorraine and the minor children." To support his position, Dennis called his accountant, Peter Poulos, as a witness. The accountant testified that all of the documentary evidence of income and expenses from both Plush Pup and Nasty Habits supported Dennis' testimony concerning his income, and no cash discrepancies existed between the deposits of daily receipts and the cash journals for both businesses. On cross-examination, however, Poulos admitted that he took the figures representing the daily cash receipts from Dennis' entries, not from the cash register tapes themselves.

Following Dennis' direct examination, counsel for Lorraine again began to question Dennis about his income and monthly expenses, and again, the money Dennis admitted to spending during the first four months of 1982 exceeded his admitted income by nearly $11,000. Dennis attempted to reduce his income figure by recalling that the money for the $7,400 fee he had paid to his attorneys came from loans from his mother and a friend and therefore was not to be included as income; however, he had testified earlier that he had not borrowed any money in 1982. Dennis also stated that nearly all expenses for his vacation in Florida, including food and lodging, had been paid for by his relatives, and an expense of $1,460 for a Christmas party had been

paid for by Nasty Habits. Further, Dennis' admitted expenditures did not include any amounts for incidental expenses such as personal items, entertainment, laundry, food, or anything connected with gifts for the children on their visitation periods with him. Even with the subtraction of the challenged items from Dennis' expenditures, the total of the amount he spent still exceeded his claimed income by approximately $2,000.

On June 8, 1982, at the conclusion of the hearing, the trial court found Dennis to be in wilful contempt of court for failure to pay $12,396 in past due unallocated maintenance and child support. On June 17, the trial court entered its findings, among them that Dennis had the same employment, business interests, personal expenses, living arrangements, and lifestyle as he had had during the dissolution proceedings, that none of his current bills was overdue, that he had contradicted his own testimony on the question of incurred debt in 1982, and that his testimony on the question of incurred debt in 1982, and that his testimony as to his net spendable income was not believable or creditable. Consequently, the court held that because Dennis had not met his burden of proving a clear inability to pay the ordered amount of family support, he was found to be guilty of wilful contempt of court and accordingly was sentenced to serve 20 days in the Cook County House of Corrections; he could regain his freedom upon payment of one-third of the arrearage. Enforcement of the contempt citation and jail sentence was stayed by order of the appellate court pending appeal.

Meanwhile, on March 11, 1982, Lorraine filed an "Emergency Motion for the Appointment of a Receiver and/or Sequestrator" to take immediate custody, control and possession of all Dennis' businesses and business assets on the ground that Dennis had failed to comply with the court's order concerning family support and now claimed that physical problems prevented him from operating his businesses and thereby supporting Lorraine and the children. Both petitions, one for the contempt citation and the other for the appointment of the receiver-sequestrator, were continued from time to time and finally set for a hearing on April 1, 1982, before the same judge who had presided over the dissolution proceeding. On that date, both petitions were continued again and reset for hearing on April 26, 1982, at which time the trial judge decided to proceed with the hearing on the contempt petition only, deferring the sequestration issue to a later time. After hearing the evidence on April 26, 1982, the trial court, on June 8, announced its findings and on June 17 entered the contempt order discussed earlier.

Nearly two weeks later, on July 1, 1982, the date previously set for the hearing on Lorraine's request for appointment of a receiver/sequestrator, Dennis filed a petition for a change of venue for the sequestration hearing; the petition was denied on July 16, 1982, and the denial confirmed as to the issue of the receiver/sequestrator on August 4, 1982. Although Dennis filed several detailed objections to the appointment, on September 9, 1982, the court entered an order appointing Richard Hoffman the receiver of JNH Enterprises, Inc., with authority to operate the business until he could arrange a reasonable sale. Further, Hoffman was appointed sequestrator of Dennis' stock in Plush Pup, Inc., and Plush Pup II, both appointments to take effect without the necessity of Hoffman's posting bond. Dennis filed his appeal on the same day.

OPINION

I

In his first appeal, that from various provisions of the dissolution of marriage judgment Dennis claims that the trial court abused its discretion (1) in its distribution of marital property and (2) in its award of unallocated maintenance and child support. Specifically, Dennis argues that first, the marital property division was unfair because his share of the marital estate was overstated by two amounts, the one-third interest in Plush Pup II and the value of the furniture in his apartment, and second, both his income and the needs of Lorraine and the children were significantly less than the figures determined by the trial court.

Division of property and awards of maintenance and child support are formulated according to the statutory provisions contained in sections 503, 504, and 505 of the Illinois Marriage and Dissolution of Marriage Act:

"Disposition of property.

\* \* \*

(b) All property acquired by either spouse after the marriage and before a judgment of dissolution of marriage \*\*\* is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of coownership \*\*\*.

(c) In a proceeding for dissolution of marriage \*\*\* the court shall \*\*\* divide the marital property without regard to marital misconduct in just proportions considering all relevant factors, including:

(1) The contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the value of the property set apart to each spouse;

(3) the duration of the marriage;

(4) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children;

\* \* \*

(7) the age, health, station, occupation, amount and sources of income vocational skills, employability, estate, liabilities, and needs of each of the parties;

(8) the custodial provisions for any children;

(9) whether the apportionment is in lieu of or in addition to maintenance; and

(10) the reasonable opportunity of each spouse for future acquisition of capital assets and income." Ill. Rev. Stat. 1981, ch. 40, par. 503.

"Maintenance. (a) In a proceeding for dissolution of marriage \*\*\* the court may grant a maintenance order for either spouse, only if it finds that the spouse seeking maintenance:

(1) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and

(2) is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home, or

(3) is otherwise without sufficient income.

(b) The maintenance order shall be in such amounts and for such periods of time as the court deems just \*\*\* after consideration of all relevant factors, including:

(1) the financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) the time necessary to acquire sufficient education or training to enable the party seeking maintenance to find ap-

propriate employment;

(3) the standard of living established during the marriage;

(4) the duration of the marriage;

(5) the age and the physical and emotional condition of both parties; and

(6) the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

(c) The court may grant and enforce the payment of such money for equitable maintenance during the pendency of an appeal which is against the party receiving such equitable maintenance, as the court shall deem reasonable and proper.

(d) No maintenance shall accrue during the period in which a party is imprisoned for failure to comply with the court's order for the payment of such maintenance." Ill. Rev. Stat. 1981, ch. 40, par. 504.

"Child support; Contempt; Penalties. (a) In a proceeding for dissolution of marriage *** the court may order either or both parents owing a duty of support to a child of the marriage to pay an amount reasonable and necessary for his support *** after considering all relevant factors, including:

(1) the financial resources of the child;

(2) the financial resources and needs of the custodial parent;

(3) the standard of living the child would have enjoyed had the marriage not been dissolved;

(4) the physical and emotional condition of the child, and his educational needs; and

(5) the financial resources and needs of the noncustodial parent ***.

(b) Failure of either parent to comply with an order to pay support shall be punishable as in other cases of contempt. In addition to other penalties provided by law the Court may, after finding the parent guilty of contempt, order that the parent be:

* * *

(2) sentenced to periodic imprisonment for a period of not to exceed 6 months; provided, however, that the Court may permit the parent to be released for periods of time during the day or night to:

(a) work; or

(b) conduct a business or other self-employed occupation." Ill. Rev. Stat. 1981, ch. 40, par. 505.

■ The basic premise underlying review of a trial judge's decisions regarding property division is that his judgment will not be disturbed in the absence of an abuse of discretion. (*In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126.) A court's discretion will be considered abused only when no reasonable man would agree with the decision reached by the trial court; "if reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126, 129.

Dennis maintains that the trial court abused its discretion when dividing the marital property because (1) included in Dennis' share was one asset, the one-third interest in Plush Pup II, that he alleges he had been forced to sell for one-tenth of its stipulated value, and (2) no evaluation was made of the furniture in the marital home, so the court had no basis for its determination that the new furniture in Dennis' apartment was of equal value to that in the home. Further, Dennis argues, the value of his furniture was offset totally because it was purchased with a still-outstanding loan from his mother. We find both of these arguments to be without merit.

■ ■ At the beginning of the trial, on May 28, 1981, both parties entered into a stipulation that the net equity in the two parcels of real estate, *i.e.*, the marital residence ($100,000) and the Riverwoods lot ($55,000-$60,000), was equal to the net equity in the three businesses, *i.e.*, Plush Pup, Inc. ($50,000), Plush Pup II ($50,000), and Nasty Habits ($60,000), each group of marital properties being worth $155,000 to $160,000. During the course of the trial, however, Dennis sold his one-third interest in Plush Pup II to his two partners for $4,894, an amount he claims was one-third the book value of the corporation's stock. Although Dennis asserts that his partners forced him to sell and that the low purchase price was controlled by a written shareholder's buy-sell agreement, our reading of that agreement and analysis of the circumstances of the sale lead us to agree with the trial court that the alleged sale of Dennis' interest in Plush Pup II was designed "to thwart the proper distribution of assets ***."

The buy-sell agreement, first executed by the three partners in 1974 and amended thereafter, contained a provision, labeled as paragraph 7(a), that fixed the per share purchase price at book value; Dennis maintains that $4,984 was exactly one-third of the book value of $14,952. However, paragraph 7(b) of the same agreement recited that "in any computation regarding the value of shares of a selling or deceased shareholder hereunder, the value shall be pegged at a minimum of $50,000 so that in any event the consideration passing to a

selling shareholder *** shall be the sum of $50,000." Dennis, therefore, had the guaranteed right to receive at least $50,000 for his interest in Plush Pup II.

In the face of Dennis' guaranteed right to receive at least $50,000 for his one-third interest in Plush Pup II, the trial court found that the entire transaction, but especially Dennis' willing acceptance of one-tenth the guaranteed price, was evidence of a sham sale. Although we disagree with the trial court's conclusion that the sale was a sham, mainly because Lorraine did not present the necessary evidence to prove that Dennis retained control over this stock (*Demos v. Demos* (1972), 8 Ill. App. 3d 906, 290 N.E.2d 304), we do agree that his share of the marital estate should be credited with the entire $50,000.

No portion of the shareholders' agreement provided for an involuntary sale in which one or more of the partners could force a remaining partner to sell his stock involuntarily. The evidence Dennis presented to support his story that his partners forced him out of the Plush Pup II corporation was found to be inherently unbelievable by the trial judge, who is not required to believe even uncontradicted testimony if it is inherently unreasonable or improbable. (*Tepper v. Campo* (1947), 398 Ill. 496, 76 N.E.2d 490.) It is clear that Dennis relinquished this asset at a very questionable time for reasons benefitting only himself, thereby willingly depriving the marital estate of over $45,000 in assets. This action clearly qualifies as a dissipation of marital assets for which Dennis will be held accountable in the property division. (*Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 386 N.E.2d 517.) A trial court's findings will be affirmed on appeal if they are supported by any evidence (*Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 163 N.E.2d 518), especially evidence as strong as a stipulation to property values, which is binding on the parties in the absence of a showing of fraud. (*Kazubowski v. Kazubowski* (1968), 93 Ill. App. 2d 126, 235 N.E.2d 664, *cert. denied* (1969), 393 U.S. 1117, 22 L. Ed. 2d 122, 89 S. Ct. 993.) Further, Dennis affirmed that stipulation in his trial memorandum. We find, therefore, that the trial court did not err in its division of marital property when it credited Dennis with the entire stipulated value of his interest in Plush Pup II.

■■ ■ Dennis further claims that, by failing to evaluate the worth of the furniture in the marital home, the trial court erred in concluding that the furniture in the marital home was equal in value to that in his apartment. While specific findings of value may be required if they are necessary to provide a basis for the trial and reviewing courts to determine the propriety of the property division (*In re Mar-*

*riage of Leon* (1980), 80 Ill. App. 3d 383, 399 N.E.2d 1006), an apportionment in kind need not be accompanied by an exact evaluation. (*In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 426 N.E.2d 1087.) Here, the language of the trial court makes it clear that its goal was to award to each party the necessary furnishings for each residence. The fact that the judge mentioned the wrong dollar amount when describing the value of the furniture in Dennis' apartment, a slip that Dennis has seized upon as evidence of an unfair marital property division, does not invalidate the decision, for the correct figure was in the record before the judge. More important, the furniture was divided sensibly so that each party had an adequately furnished residence; a monetary evaluation was not essential to an appropriate division. (*In re Marriage of Greenberg* (1981), 102 Ill. App. 3d 938, 429 N.E.2d 1334.) The decision of the trial court was clearly within its discretion.

Dennis' second claim in the first appeal is that although the trial court appropriately awarded Lorraine child support and rehabilitative maintenance, the amount awarded and the duration of the payments were an abuse of discretion because they ignored the standards set out in sections 504 and 505 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1981, ch. 40, pars. 504, 505) quoted above.

As Dennis correctly notes, these statutory provisions are mandates to the trial court, not merely guidelines. (*In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 421 N.E.2d 1308.) While the amount of the award for child support and maintenance lies within the discretion of the trial court (*Crenshaw v. Crenshaw* (1977), 45 Ill. App. 3d 880, 360 N.E.2d 576), an award not supported by the evidence must be set aside. (*Matthews v. Matthews* (1976), 42 Ill. App. 3d 1049, 356 N.E.2d 1083.) The trial court ordered monthly unallocated maintenance and child support payments of $3,000 for three years followed by monthly child support payments of $1,912.50, to continue for the children's minority or until their completion of high school, whichever occurred last. Dennis maintains that not only did the trial court fail to consider the value of the marital property apportioned to each party when it formulated the above award, but the award itself exceeded Dennis' gross income, a clear violation of each mandatory statutory provision the court was obligated to consider.

In support of his position, Dennis argues that (1) the apportionment of marital property favored Lorraine in that she received the Riverwoods real estate, valuable property that could be sold and converted into an income-producing asset whereas he had been forced to

sell one of his awarded assets, (2) Lorraine would complete her college degree and be ready to seek outside employment four months after the entry of judgment and thus would not need rehabilitative maintenance for three years, (3) Lorraine did not need $3,000 monthly to maintain the lifestyle to which she had become accustomed, and (4) the trial judge based his award on a fixed percentage of the completely speculative amount of $85,000 that he determined to be Dennis' actual income, a double error.

■ When the factual basis for the above arguments is examined closely, it reveals that all of Dennis' arguments pertaining to the award of maintenance and child support are based on a single assumption: that no evidence refutes his assertion, based on his income tax returns, that his net income is any more than $25,000. We find, as did the trial court, that ample evidence was introduced at trial to establish that Dennis' net income was far higher than $25,000, and therefore the trial court's assessment of the award Lorraine would need to support the previous lifestyle she and the children had enjoyed, as well as the amount of time needed for her to find employment paying a sufficient salary to contribute significantly to her income requirements, was not an abuse of discretion.

In support of his argument, Dennis maintains that one of Lorraine's expense sheets offered at trial shows that her reasonable monthly living expenses were only $2,085. We note that this expense sheet reflected monthly expenditures in 1978, one year before the couple's separation, and did not include several items later testified to as properly included in the couple's lifestyle. By the time of trial, however, Lorraine testified that the amount Dennis was paying her weekly did not cover the average expenses she incurred. In addition, several outstanding debts remained unpaid, necessary dental checkups were precluded, and she had no money to assume payment either for those debts or for future expenses she would have to assume after the judgment of dissolution was entered. A current expense sheet, showing her 1981 monthly expenses to be nearly $3,500, was entered into evidence and apparently accepted by the trial court as a more realistic estimate of the needs of Lorraine and the children.

■ Dennis' assumption that Lorraine would complete her college program four months after the entry of judgment is belied by the fact that although she had attended a two-year college for 2½ years, the necessity of carrying less than a full load meant that she had in that time accumulated less than one-half of the credits necessary for graduation. Consequently, it appears clear that the trial court correctly allowed her rehabilitative maintenance for three years, giving her ade-

quate time to complete her degree and find suitable employment.

Underlying the entire issue of maintenance and support is the controversy over the exact amount of Dennis' income. At trial, Dennis produced income tax returns to support his contention that he earned between $25,000 and $30,000 yearly in gross income from both Plush Pup and Nasty Habits. In contrast, however, when all the sums Dennis testified to spending were added together, they totalled more than $50,000; indeed according to one calculation, which included amounts spent for repayment of several personal loans, his expenditures totalled nearly $80,000. Further, Dennis could not remember what he spent for food, social evenings, maintaining the children during visitation periods, or personal items. Finally, when asked directly whether he received any cash from his businesses in addition to his salary, Dennis refused to answer.

■ Dennis attempted to bolster his position by introducing his corporate tax returns and explaining that the low net profit shown was due to the unprofitably high ratios of cost of goods to sales for both Plush Pup and Nasty Habits; we note with interest that the ratio of cost of goods to sales for Plush Pup II, which sold basically the same products at nearly the same prices, was considerably lower. However, when Dennis went on to testify that the low profitability was caused by the high cost of condiments on the hot dogs, a cost that exceeded the amount spent on both bun and meat together, the trial judge was within his discretion when he disbelieved Dennis' testimony. Even in the absence of directly conflicting testimony, a court is not required to believe uncontradicted testimony if it is inherently unbelievable (*Tepper v. Campo* (1947), 398 Ill. 496, 76 N.E.2d 490) or if facts in evidence indicate that the testimony is improbable (*Beatrice Foods Co. v. Gallagher* (1964), 47 Ill. App. 2d 9, 197 N.E.2d 274).

The wide discrepancy between Dennis' supposed income and his actual spending has only one explanation: Dennis and Lorraine's preseparation lifestyle was supported by at least $35,000 yearly in unreported income. The fact of the unreported income, testified to by Lorraine and admitted by Dennis' attorney at trial, provided the basis for the trial judge's award to Lorraine of $3,000 per month in unallocated maintenance and child support, based on an estimate of Dennis' actual income. *In re Marriage of Lipsch* (1980), 86 Ill. App. 3d 81, 84 n.1, 407 N.E.2d 1028, 1030-31 n.1.

The explanation for both the income discrepancy and the unbelievable cost of goods to sales ratio was provided by Peter Poulos, Dennis' accountant. He testified that he prepared Dennis' personal and corporate tax returns from the monthly entries Poulos made in both

businesses' account books. However, while the cost of goods sold was reflected accurately in monthly invoices and bills, the daily cash register tapes reflecting gross daily income were never given to Poulos; Dennis himself added up the day's receipts and simply informed Poulos of the total. The court concluded, as Dennis' attorney had admitted, that Dennis had been taking cash before entering the amount of the day's receipts.

■ After confirming the trial court's estimation of Dennis' income based on his admitted expenditures rather than on his tax returns, we find that the trial court did not abuse its discretion in awarding Lorraine $3,000 per month in unallocated support and maintenance, for the documentary evidence provided by Dennis was not only inherently unbelievable but also was revealed to have no independent basis of reliability. Although the judge's estimation that Dennis' actual income was approximately $85,000 had no direct documentary proof, there was sufficient evidence in the record to support that amount as a reasonable calculation. Further, even though an award of child support may not be based solely on a preconceived standard percentage of the income of the noncustodial spouse (*In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 421 N.E.2d 1308), a charge that Dennis makes here because the support award is 27% of his income as calculated by the trial court, such a percentage award is permissible as long as it is based on a consideration of the requisite statutory factors. (*In re Marriage of Theeke* (1981), 105 Ill. App. 3d 119, 433 N.E.2d 1311; *In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 421 N.E.2d 1308.) The trial court's findings of fact make clear that the statutory factors were taken into account when the support and maintenance awards were determined.

For all the foregoing reasons, we affirm the decision of the trial court in the first of the three consolidated appeals, No. 82—809.

II

In his second appeal (No. 82—1460) Dennis essentially asserts that the trial court's finding him to be in wilful contempt of court for failure to make the unallocated child support and maintenance payments was erroneous in that it was contrary to the manifest weight of the evidence. Dennis, while not denying the $12,396 in accrued arrearage as set forth in the trial court's order of June 17, 1982, contends that the evidence presented shows clearly that his failure to pay the allowances was simply because of his poor financial situation and that his limited income did not allow compliance with the court order. Dennis claims his failure to pay was not wilful and that his conduct was in no

respect contumacious or intentional.

██ █ Wilful failure to pay allowances for child support and maintenance as ordered by the court may be declared contemptuous misconduct and may be sanctioned accordingly. (*Sullivan v. Sullivan* (1973), 16 Ill. App. 3d 549, 306 N.E.2d 604; *Lewis v. Lewis* (1970), 120 Ill. App. 2d 263, 256 N.E.2d 660.) The failure to make the payments directed to be made pursuant to a court order or judgment is *prima facie* evidence of contempt. (*Cooper v. Cooper* (1978), 59 Ill. App. 3d 457, 375 N.E.2d 925; *Taapken v. Taapken* (1976), 39 Ill. App. 3d 785, 350 N.E.2d 794; *Shapiro v. Shapiro* (1969), 113 Ill. App. 2d 374, 252 N.E.2d 93.) A party who fails to pay the allowances ordered has the burden of proving that his failure to comply was not wilful or contumacious and that he has a valid excuse for his failure to pay. *Comiskey v. Comiskey* (1977), 48 Ill. App. 3d 17, 366 N.E.2d 87; *White v. White* (1976), 41 Ill. App. 3d 758, 354 N.E.2d 486; *Storm v. Storm* (1973), 9 Ill. App. 3d 1071, 293 N.E.2d 633.

██ Whether the person charged is in wilful contempt and whether a sanction is to be imposed are factual matters to be determined by the trial court from the evidence presented to it. A reviewing court will not upset the trial court's finding of wilful or contumacious misconduct on the part of the person obligated to make the payment of allowances unless the trial court's factual conclusions are contrary to the manifest weight of the evidence. *Shive v. Shive* (1978), 57 Ill. App. 3d 754, 373 N.E.2d 557.

Our review of the record compels us to conclude that there was more than ample evidence presented to find Dennis in wilful contempt for failing to abide by the order of the trial court directing the payment of the allowances for child support and maintenance. The critical issue was to determine if indeed Dennis had the ability to pay the allowances, and despite his ability so to do, he failed, without reasonable cause or excuse, to meet his obligation.

In the first appeal (No. 82—809), Dennis attacked the trial court's award of allowances, property valuation and property distribution. In the disposition of this appeal, we have set out in considerable detail the trial court's findings and analysis of the parties' financial state, resources, property ownership, and respective abilities to meet their economic needs. It would needlessly prolong this opinion to review again the financial details that supported the trial court's conclusions and that supported this court's affirmance thereof. The financial and related evidentiary findings are directly intertwined with the issue concerning Dennis' alleged wilful failure to pay the allowances ordered. The financial and property picture already drawn manifestly

requires that the contempt finding and sanction be affirmed. Additionally, we find compelling Dennis' refusal to disclose any information regarding the details and amounts of his cash business receipts, a matter that can readily explain his ability to enjoy a standard of living higher than is disclosed by his record documentations and that would also permit him to meet the requirements of the order granting allowances.

■■ The trial court was in the best position to determine Dennis' credibility and either accept or reject certain of his testimony. (*In re Marriage of Stallings* (1979), 75 Ill. App. 3d 96, 393 N.E.2d 1065.) Our review of the extensive record confirms that the trial court acted within the scope of its legal authority and that its conclusions were not contrary to the manifest weight of the evidence; Dennis had the financial ability to comply with the trial court's order, and his failure to do so was wilful and contumacious.

A reviewing court should not interfere with the trial court's factual determination unless the trial court has ruled contrary to the manifest weight of the evidence or has clearly abused its discretion. (*Shive v. Shive* (1978), 57 Ill. App. 3d 754, 373 N.E.2d 557.) We believe the trial court here acted in conformity with the required legal principles and standards, and accordingly, we find no basis for upsetting the trial court's determination that Dennis was guilty of wilful contempt and that the sanction imposed was proper. *In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 398 N.E.2d 126.

### III

In his third appeal (No. 82—2200), Dennis raises three points of error: (1) that the trial court's erroneous denial of his amended petition for a change of venue caused all subsequent orders entered by the trial court to be void, including the order appointing the receiver-sequestrator; however, even if the court properly denied Dennis' amended petition for a change of venue, the appointment of the sequestrator-receiver was reversible error because (2) no hearing was conducted prior to the appointment, and (3) the court was without jurisdiction to hear and rule on the sequestration petition. We find all three contentions to be without merit.

Regarding Dennis' charge that the trial court improperly denied his petition for a change of venue, we find that although Dennis correctly states that a trial judge has no discretion to deny a proper and timely request for a change of venue (*In re Marriage of Cummins* (1982), 106 Ill. App. 3d 44, 435 N.E.2d 506), Dennis' petition in the instant case was not timely.

Sections 501 and 503 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, pars. 501, 503), now section 2—1001 of the Code of Civil Procedure (Ill. Rev. Stat.1983, ch. 110, par. 2—1001) provide, *inter alia*, that a party fearing an unfair hearing because of the prejudice of the trial judge has a right to a change of venue as long as the judge has not yet ruled on a substantial issue in the case. Dennis maintains that his petition for a change of venue was timely because no evidence had been heard on the petition for sequestration, and thus the judge had the nondiscretionary duty to grant the change of venue. *In re Marriage of Cummins* (1982), 106 Ill. App. 3d 44, 435 N.E.2d 506.

■■■ Prior to April, 1984, the general rule in Illinois regarding venue in post-dissolution actions had been established by the appellate court, which maintained the position that a petition to enforce or modify a dissolution decree constituted a new proceeding, and therefore a change of venue was permissible. (*Rosenblum v. Murphy* (1976), 42 Ill. App. 3d 1029, 356 N.E.2d 888.) However, in the recent decision *In re Marriage of Kozloff* (1984), 101 Ill. 2d 526, 531-32, the Illinois Supreme Court conclusively rejected that position and held that "post-decree petitions do not constitute new actions, but merely continuations of the dissolution proceeding, and a substantive ruling on one petition will preclude a change of venue as of right on another. *** It follows that a judge's substantive ruling during the dissolution proceeding will preclude a change of venue as of right on a post-decree petition before that same judge. *** [However,] the assignment of a different judge at any point in the proceedings entitles the parties to a change of venue as of right if that judge has not made a substantial ruling in the case." Because all the proceedings in the instant case were before the same judge, we find that the trial court did not err in denying Dennis' petition for a change of venue in the sequestration proceeding, and all subsequent orders were not rendered void by the denial.

Dennis' second argument, that the appointment of the "Receiver and/or Sequestrator" was void because no hearing was conducted prior to the appointment, is based on the requirements for the appointment of a receiver as set forth in section 407 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 407), now section 2—415(a) of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—415(a)):

> "Appointment of and actions against receivers. (a) Before any receiver shall be appointed the party making the application shall give bond to the adverse party *** in case the ap-

pointment of such receiver is revoked or set aside. Bond need not be required, when for good cause shown, and upon notice and full hearing, the court is of the opinion that a receiver ought to be appointed without such bond."

■■■ No hearing was ever held on the specific issues of the necessity of the appointment of a receiver or on the propriety of waiving the bond requirement; therefore, Dennis claims, appointment of the receiver/sequestrator was error. While we agree that the statutory requirements for the appointment of a receiver were not met, we do not find that failure to be reversible error.

Both Lorraine's petition and the court's order speak of the appointment of a "Receiver and/or Sequestrator," an indication that either alternative would provide an appropriate solution to the severe financial difficulties Lorraine was experiencing because of the amount of Dennis' arrearage in unallocated maintenance and child support payments. In its order, the court named Richard Hoffman as receiver of JNH Enterprises and sequestrator of Dennis' business interests in the two hot dog stands. However, the circumstances of the case were not severe enough to justify the drastic action of appointing a receiver, a remedy "appropriate only when dissension, fraud, misconduct or mismanagement exist which make it impossible for the business to continue or to preserve its assets. *** [N]either misconduct nor dissension alone can justify the appointment of a receiver. It must be shown that the dissension or misconduct made it impossible for the business to continue to preserve its assets ***." *Prassas v. Nicholas W. Prassas & Co.* (1981), 102 Ill. App. 3d 319, 321, 430 N.E.2d 28, 30.

On the other hand, a sequestrator is a person appointed by the court to take "into the custody of the law *** the real and personal estate (or rents, issues and profits) of a defendant who is in contempt, and holding the same until he shall comply." (Black's Law Dictionary 1531 (rev. 4th ed. 1968).) In addition, sequestration is a remedy specifically noted as an available technique to enforce a judgment of dissolution (Ill. Ann. Stat., ch. 40, par. 511, Historical and Practice Notes at 785 (Smith-Hurd 1973)), and a sequestrator has been held to have the very powers authorized in the instant case—to seize and manage or sell assets awarded to a respondent to satisfy nonpayment of monies awarded in a judgment of dissolution. *In re Marriage of Rochford* (1980), 91 Ill. App. 3d 769, 414 N.E.2d 1096.

Case law indicates that although the power of sequestration has been exercised most often for nonpayment of maintenance where the defendant has been cited for contempt (*Rochford; Factor v. Factor*

(1975), 27 Ill. App. 3d 594, 327 N.E.2d 396; *Wightman v. Wightman* (1867), 45 Ill. 167), a contempt finding is not a prerequisite. (*Ryan v. Ryan* (1978), 56 Ill. App. 3d 483, 371 N.E.2d 1199.) What does appear to be necessary is merely a finding that a valid judgment of dissolution is in existence, and defendant has failed to comply with its orders regarding payment of maintenance and child support. Since ample evidence of these two issues was heard during the hearing on the rule to show cause, any requirement of a hearing before appointment of a sequestrator has been satisfied.

██ We therefore find that Dennis' failure to comply with the court's order, his being found in contempt, and his persistent claim that his income is less than one-third the amount determined by the trial court and affirmed on appeal, all provided justification for the appointment of a sequestrator to seize his property and thereby enforce the provisions of the judgment of dissolution. The fact that the trial judge mistakenly labelled Richard Hoffman receiver of JNH Enterprises, Inc., instead of sequestrator does not change the duties imposed upon him; whereas a receiver is appointed to hold and manage property to preserve it from destruction during pending litigation (*Firebaugh v. McGovern* (1949), 404 Ill. 143, 88 N.E.2d 473), a sequestrator is appointed to seize and sell the assets held by the noncomplying party. (*In re Marriage of Rochford* (1980), 91 Ill. App. 3d 769, 414 N.E.2d 1096.) The fact that a sequestrator might have to manage property during the period of time a buyer is being sought does not automatically transform him into a receiver. Richard Hoffman's directions were to sell each of Dennis' assets, thereby making the designation "sequestrator" the appropriate one.

██ Dennis' final claim of error is that the trial court had no jurisdiction to enter the order appointing the sequestrator because (1) his appeal from the judgment of dissolution of marriage (case No. 82—809 discussed above) precluded the trial court from taking any action that affected the property division contained in that judgment, and (2) the trial judge, in holding that the sequestration proceeding was "ancillary *** [and] only for the enforcement of my order for contempt," was bound by the stay order granted by the appellate court and therefore had no jurisdiction to enter additional orders to enforce the finding of contempt. We find no merit in either of these arguments.

Supreme Court Rule 305 (73 Ill. 2d R. 305) states,

"(a) Stay of Enforcement of Judgment for Money Only.

(1) An appeal stays the enforcement of a judgment for money only if a notice of appeal is filed within 30 days after the entry

of the judgment appealed from and a bond in a reasonable amount to secure the appellee is presented, approved, and filed within the same 30 days or within any extension of time granted ***.

\* \* \*

(b) Stay of Enforcement of Judgments and Appealable Orders by Order of Court.

(1) On notice and motion, and an opportunity for opposing parties to be heard, the trial court, or the reviewing court *** may stay pending appeal the enforcement of a judgment for money only not stayed by compliance with paragraph (a) of this rule ***.

\* \* \*

(3) The stay, whether granted by the trial or reviewing court, shall be conditioned upon such terms as are just. A bond may be required in any case, and in the case of a judgment for money, or a stay for the protection of interests in property, shall be required."

The record discloses no posting of bond, nor any request for a stay of that portion of the judgment dealing with money, *i.e.*, the provisions for unallocated maintenance and child support. The mere filing of a notice of appeal does not automatically stay the trial judge's jurisdiction over proceedings to enforce the judgment. (*Graff v. Graff* (1979), 71 Ill. App. 3d 496, 389 N.E.2d 1206.) Further, section 413 of the Illinois Marriage and Dissolution of Marriage Act provides that execution of an order directing payment of money for maintenance or child support may not be stayed. (Ill. Rev. Stat. 1981, ch. 40, par. 413.) Accordingly, we find that Dennis' appeal from the judgment of dissolution of marriage does not stay the jurisdiction of the trial court to enforce an order pertaining to the payment of maintenance and child support.

It is clear from the foregoing analysis that the stay of the penalty for contempt, the jail sentence, does not affect the independent remedy of sequestration; all that has been stayed is enforcement of the penalty of imprisonment. The judge was incorrect when he called the sequestration action ancillary to his finding of contempt; however, an incorrect labelling does not render a correct decision incorrect. The appointment of a sequestrator was within the enforcement power of the trial court whether the judge called it an independent power or an ancillary one. Accordingly, we find no error in the decisions of the trial court regarding any stay of enforcement of either the judgment of dissolution or that of contempt.

For all of the reasons noted, we affirm the orders entered by the trial court.

Affirmed.

JIGANTI and ROMITI, JJ., concur.